LOUISE E. FIELDERS, DEFENDANT IN ERROR,.v. NORTH JERSEY STREET RAILWAY COMPANY, PLAINTIFF IN ERROR.

Argued March 18, 1902—Decided November 17, 1902.

1. Shortly after plaintiff alighted from one of defendant's street cars she fell in the street and was hurt. The immediate occasion of her fall was a defect in the street pavement between the rails of defendant's track. She charged the defendant with negligence in three particulars—(*a*) that the car was brought to a stop at an unsafe and improper place; (*b*) that the conductor negligently directed her towards her destination, and (*c*) that the defendant had neglected to repair the street pavement as.required by the terms of a municipal ordinance. The trial judge withdrew from

the jury's consideration the first and second grounds of complaint because of want of evidence to support them, and submitted the case to the jury solely upon the third ground. A verdict having thereupon gone against the defendant—*Held,* that the judgment cannot be sustained on the theory that the evidence would have justified a finding against the defendant on either of the first two grounds.

2. A city ordinance in terms requires all street railway companies to pave, repave and keep in repair, under the direction and to the satisfaction of the proper municipal authorities, the space between the rails of their tracks and between the tracks, and the space for one foot outside of each outer track, at the same time providing that if any company fail so to pave or repave, or to keep the pavement in repair, the city authorities may cause the work to be done, and the company shall, on demand, pay the cost thereof. *Held,* as a matter of construction, that the ordinance does not confer a right of action upon any member of the traveling public, who may sustain damage through the non-repair of the street.

3. *Held further,* that the ordinance in question is an assumption of the power of taxation and cannot be supported under the police powers conferred upon the municipality by the legislature.

4. The case of *North Hudson County Railway Co.* v. *Hoboken,* 12 *Vroom* 71, commented on and explained.

On error to the Supreme Court, whose decision is reported in 38 *Vroom* 76.

For the plaintiff in error, *George T. Werts.*

For the defendant in error, *Frederick E. Hodge* and *Samuel Kalisch.*

The opinion of the court was delivered by

PITNEY, J. So far as the opinion of the Supreme Court bases the affirmance of the judgment of the trial court upon the theory that the plaintiff, at the time of her injury, was in the exercise of her rights as a passenger in the act of leaving the defendant's car, it cannot be sustained. Whatever inference might have been drawn from the evidence upon that subject is a matter of no consequence, for no verdict has been rendered against the defendant upon the ground of neglect of any duty that it owed to the plaintiff as a passenger. The trial court charged the jury (apparently with the acquies-

cence of plaintiff's counsel) that the evidence sufficiently showed that the plaintiff had left the car, and, being in safety upon the highway, was thenceforth a traveler upon the highway, and subject to all the duties and obligations imposed upon such travelers; and thereupon proceeded to submit the case to the jury solely upon the question whether the defendant had been guilty of a breach of duty owed by it to the plaintiff as a traveler upon the highway. The verdict and judgment, having gone upon this theory, cannot be sustained upon the theory that the defendant's conductor had negligently misdirected the plaintiff about alighting from the car and reaching the sidewalk, or had negligently stopped the car at an unsafe and improper place. The defect in the pavement, therefore, instead of being a mere circumstance to be viewed with other circumstances as bearing upon the question of negligence in stopping the car, or negligence in directing the plaintiff towards her destination, becomes the essential fact upon which alone the negligence of the defendant company is to be predicated. And if the judgment can be sustained, it must be upon the ground that the plaintiff has an action against the defendant for a personal injury occasioned by the non-repair of the street pavement while she was a foot passenger upon the street, and irrespective of the consideration that she had ridden upon the defendant's car.

The defect in question was a deep hole in the street pavement between the rails of the track, and according to the plaintiff's evidence this was the immediate occasion of her injury. There was evidence tending to show that the hole was the result either of non-repair or improper repair of the pavement, and that it had existed for a sufficiently long time to put the defendant upon notice, if the defendant was bound in law to take notice of the condition of the pavement. Of course if the defendant was under an absolute duty to repair the pavement, it was at the time under a duty to observe its condition. Therefore, in all aspects the case was one proper for the jury's consideration, if there existed a legal obligation upon the defendant to repair the pavement.

There is nothing in the case to show that the pavement in

question had been laid or maintained by the defendant or that the defect resulted from any act of commission on the defendant's part. Nor is there anything to connect the defect with the defendant's rails or sleepers, or to show that anything done or omitted in the construction, maintenance or operation of the railway produced the defect. The location of the hole between the rails is a mere circumstance without causative significance. And the only default attributable to the defendant is the failure to repair.

It is familiar law that a railway company, having the right to lay tracks in a public street, is bound by the general principles of the common law, and without either a specific statute or ordinance, or a contractual obligation, to lay its tracks in a proper manner, and to keep them in a proper state of repair. 2 *Thomp. Negl.* (2d ed.), § 1353. But the question of the liability of such a company for failing to keep the surface of the street in repair is quite a different question. Such a liability does not result from the mere fact that the corporation has been vested with a franchise or license of using the public street. The liability to maintain the pavement as such, if it exists, must either be rested upon some valid statute or ordinance imposing such a duty, or must arise out of the obligations of a contract. It has been repeatedly held that where some burden is lawfully imposed by a municipality upon a street railway company as a condition of the grant of its franchise, the acceptance of such a condition by the company constitutes a contract between the company and the municipality. *Wilbur* v. *Trenton Passenger Railway Co.,* 28 *Vroom* 212; *Railroad Co.* v. *Cape May,* 29 *Id.* 565; *Cape May* v. *Transportation Co.,* 35 *Id.* 80; *Dean* v. *City of Paterson,* 38 *Id.* 199. Were an ordinance of such a character invoked in the present case the question would remain whether the plaintiff, having no privity therein, could sue for a breach of its provisions. In *Appleby* v. *State,* 16 *Id.* 165, Mr. Justice Depue, speaking for this court, said: "A duty, the breach of which is an actionable wrong, may arise from a contract or be imposed by positive law, independent of contract. In the first case the party to the contract only can sue; in the

other case any person injured may sue if he be one of the class of persons for whose benefit the duty is imposed." The rule here recognized was enforced by the Supreme Court in *Marvin Safe Co.* v. *Ward,* 17 *Id.* 19; *Styles* v. *F. R. Long Co.,* 38 *Id.* 413.

But the present case is devoid of evidence to show that any liability for the repair or maintenance of the street pavement was imposed upon the defendant as a condition of its right to exercise its franchise, or that the defendant, by any contract, has undertaken such a duty. The plaintiff introduced in evidence an ordinance adopted by the board of street and water commissioners of the city of Newark September 6th, 1894, purporting to apply to all street railways and imposing upon the operating companies the duty of paving, repaving and repairing the space between the rails. Its terms will be set forth more fully below. Defendant's duty to repair was rested upon that ordinance alone. The trial court, and also the Supreme Court, treated it as a valid police regulation, imposing an absolute duty upon the defendant for the general benefit of the traveling public, so that an action would lie at the instance of any traveler injured through a neglect of the imposed duty to repair the pavement. The bills of exceptions clearly raise the question whether a duty of repair was lawfully imposed upon the defendant by the ordinance in question, and whether the plaintiff, as a traveler upon the highway, was one of the class for whose benefit that duty was imposed.

It is certainly well settled that a specific duty, the violation of which is actionable, may arise from a valid statute or municipal ordinance, as well as from the general principles of the common law. Familiar examples among our statutes are the so-called "law of the road" (*Gen. Stat., p.* 2823, § 91), and the requirement that a railroad locomotive shall sound a bell or whistle on approaching a highway crossing. *Gen. Stat., p.* 2645, § 29. The books contain many cases arising out of breaches of the latter duty. The duty imposed upon railroad companies "to use all practicable means to prevent the communication of fire from any locomotive engine," and making them liable in damages to the person

injured, is an instance. _Gen. Stat., p._ 2670, §§ 13, 14; _Delaware, Lackawanna and Western Railroad Co._ v. _Salmon,_ 10 _Vroom_ 299, 303. So is the duty to provide spark arresters. _Gen. Stat., p._ 2671, §§ 15, 16; _Wiley_ v. _West Jersey Railroad Co.,_ 15 _Vroom_ 247; _Hoff_ v. _West Jersey Railroad Co.,_ 16 _Id._ 201; _West Jersey Railroad Co._ v. _Abbott,_ 31 _Id._ 150. So, doubtless, are such of the provisions of the act relating to factories, &c. (_Pamph. L._ 1885, _p._ 212; _Gen. Stat., p._ 2345), as are expressly designed for the personal safety of the operatives. Other instances might be cited.

Nor does there seem to be any distinction between a valid statute and a valid ordinance, in respect to the binding force of a duty created thereby. A lawful municipal ordinance is an exercise of the delegated power of legislation, and is the law of the place. When adopted in the exercise of that power which is commonly called the "police power," ordinances frequently prescribe for persons subject thereto a rule of conduct, for the purpose of insuring the safety of others. Familiar instances of municipal ordinances imposing duties, for a breach of which an action may be maintained by any person specially injured, are those regulating the speed of vehicles in streets, those requiring railroad companies to place gates or flagmen at street crossings, those regulating excavations in the streets, the use of explosives, and the like. In _New Jersey Express Co._ v. _Nichols,_ 3 _Vroom_ 166, 169; _S. C.,_ 4 _Id._ 434, 441, the plaintiff was attempting to pass along a sidewalk in the city of Newark when he was caught and injured by the wagon of the defendant being backed up to the side of the building adjoining the walk for the purpose of taking in packages from the building. The fact that the wagon was thus backed, in violation of a city ordinance, was a circumstance considered as material by the Supreme Court and by this court upon the question of defendant's negligence. In _New Jersey Railroad Co._ ads. _West,_ 3 _Id._ 91; _S. C.,_ 4 _Id._ 430, the plaintiff was watching a railroad train approaching a street crossing from one direction, at a rate exceeding that limited by the city ordinance, and was struck by a train coming from the opposite direction at a less speed. The ordi-

nance required no flagman at this crossing, and the defendant company relied upon the ordinance, and claimed to have complied with it. This court treated the fact that the fast train was exceeding the limit fixed by the city ordinance as a circumstance tending to show negligence on the part of the defendant, and to rebut the allegation that there was contributory negligence on the part of the plaintiff.

In some jurisdictions contention has arisen as to whether the violation of a statute or ordinance intended to regulate the conduct of the individual constitutes negligence *per se,* or conclusive evidence of negligence; or whether, on the other hand, such violation is only *prima facie* evidence of negligence. Abundant citation of authorities will be found in 21 *Am. & Eng. Encycl. L.* (*2d ed.*), *tit. "Negligence,"* 460, 478, 483; *Thomp. Negl.* (*2d ed.*), §§ 10, 773, 1094, 1196, 1226, 1394, 1396, 1528, 1538, 1554, 1900, 1905, 2103.

Perhaps the doubts have arisen from confusing the action for violation of a specially imposed duty with the action for violation of the common law duty of exercising care under given circumstances. It would seem that a correct definition of actionable negligence must include the notion that a legal duty has been violated; whether the duty arose from the common law or from a valid statute or municipal ordinance would seem immaterial. See *Thomp. Negl.* (*2d ed.*), §§ 1, 12. Assuming the party injured in a given case to be one of a class for whose benefit a duty has been by statute or ordinance imposed upon the opposite party, and assuming that the evidence shows an actual breach of that duty, it would seem the sole remaining inquiries should be whether the violation of the imposed duty was the proximate cause of the injury, and if so, whether any faulty conduct of the injured party was a contributing cause. This view of the matter would give to the party aggrieved by a violation of a duty that had been imposed for his benefit the right to maintain an action for an injury thereby sustained, irrespective of the question whether the conduct complained of could be properly termed negligent in the general sense. This is the case with those statutory actions that stand quite apart from negligent conduct; such, for instance, as the

action for damages for excessive distress under the statute of Marlbridge (52 *Henry III.*), embodied in our act concerning distresses as section 1 (*Gen. Stat., p.* 1207), and the special action for a mere irregularity in the proceedings consequent upon a lawful distress for rent, which action was conferred by the statute 2 *Geo. II., c.* 19, § 19, whose provisions are found in section 12 of our act concerning distresses.

Without pursuing the subject further, we assume, for the purposes of the following discussion, that there is no distinction between a common law duty and one imposed by statute or ordinance, with respect to entitling a party injured to his damages; and no distinction between a valid statute and a valid ordinance with respect to its effect in imposing a duty for violation of which an action will lie.

But the action for breach of a duty, however the duty be created, is only for the benefit of the party aggrieved. We are at once confronted with the inquiry: "To whom is the duty owing; for whose benefit was it created?" Hence arises a rational distinction that seems to have been recognized from the earliest times. Thus in *Com. Dig., tit. "Action upon Statute"* (*F.*), it is laid down that "in every case where the statute enacts or prohibits a thing *for the benefit of a person, he shall have a remedy* upon the same statute," &c. See, also, *Cooley Torts* 650, 658.

A leading English case is *Couch v. Steel* (1854), 3 *El. & B.* 402; 23 *L. J., Q. B.* 121. There was a statute which enacted that every ship on a foreign voyage should be supplied with certain medicines, and the action was brought against the shipowner by a seaman, alleging a breach of this duty and consequent loss of health to the plaintiff. Lord Chief Justice Campbell said: "The enactment provides a benefit for the seaman; and thereby the plaintiff, being a seaman on board, was deprived of that benefit, and his health was injured." Accordingly the action was sustained. This decision was not distinctly overruled, but the generality of Lord Campbell's reasoning was criticised by the Court of Appeal in *Atkinson v. New Castle, &c., Water Works Co.* (1877), *L. R., 2 Exch. Div.* 441; 46 *L. J., Exch.* 775. The water company failed in

its statutory duty to maintain fire-plugs with pipes filled with water at a certain pressure. The court held that a property-owner, whose buildings had been burned in consequence of the water company failing in this duty, had no action against the company. These cases are cited by Mr. Justice Dixon in *Weller* v. *McCormick*, 23 *Vroom* 472, as authority for the discriminating statement of the rule to which he there gives expression, viz.: "For it is a general principle that where there rests upon any person a public duty, either arising at common law or created by statute, and that duty is due to the public, *considered as composed of individuals,* and for their protection, each person specially injured by breach of the obligation is entitled to a private action to recover compensation for his damage."

And the same distinction is recognized in the language already quoted from *Appleby* v. *State,* 16 *Vroom* 165.

The decision in *Sonn* v. *Erie Railroad Co.,* 37 *Vroom* 428, affirmed in this court for the reasons given in the court below (38 *Id.* 350), recognizes this distinction. There the rail-road company was required by the charter under which its road was constructed and operated (*Pamph. L.* 1867, *p.* 301, § 9), "to construct and keep in repair good and sufficient bridges over or under the said railway where any public or other road shall cross the same, so that the passage of carriages, horses and cattle across the said railway shall not be impeded thereby." Here was a positive unconditional duty imposed for the express benefit of the traveling public, and although the same section provided that if the company neglected to perform the duty, the public officers having charge of the repairs or maintenance of the road, and having unsuccessfully warned the company, might proceed to do the work and recover the cost from the company, it was held by the Supreme Court that the plaintiff was one of the class of persons for whose benefit the duty was imposed, and might sustain an action for damages arising from its breach. In the argument of the case in this court the construction adopted by the Supreme Court was not in this respect questioned.

In examining a municipal ordinance in the effort to determine its scope and purview, an important and sometimes controlling inquiry is, whether it was passed in the exercise of the police powers of the municipality for the regulation of the conduct of persons within the corporate limits in order to conserve the safety of persons or property, or whether it is an exercise of the taxing power or of some other governmental power. We find running through the adjudicated cases a rule ' of construction almost universally adopted, that where the provisions of an ordinance are intended not for the benefit or protection of individuals comprising the public, but for the benefit of the municipality as an organized government, and more particularly if they impose upon property-owners the performance of a part of the duty of the municipality to the public, a legislative intent is indicated that a breach of such ordinance shall be remediable only at the instance of the municipal government or by enforcement of the penalty prescribed therein; and that there shall be no right of action to an individual citizen especially injured in consequence of such breach. The most conspicuous cases of this sort are those that deny liability to private suit for violation of the duty imposed by ordinance upon abutting property-owners to maintain sidewalk pavements or to remove ice and snow from the walks. *Moore* v. *Gadsden*, 93 *N. Y.* 12; *City of Rochester* v. *Campbell*, 123 *Id.* 405; *Kirby* v. *Boylston Market Association*, 14 *Gray* 249; *City of Hartford* v. *Talcott*, 48 *Conn.* 525; *Flynn* v. *The Canton Co.*, 40 *Md.* 312; *Taylor* v. *Lake Shore Railroad Co.*, 45 *Mich.* 74.

Two reported decisions in our Circuit Courts indicate the general acceptance of this distinction in this state. *Snowden* v. *Dodd*, 8 *N. J. L. J.* 296 (*Essex Circuit*, 1885, *Depue, J.*); *Courtney* v. *Central Railroad Co.*, 18 *Id.* 173 (*Union Circuit*, 1895, *Van Syckel, J.*).

That the New York and Massachusetts cases just referred to proceed upon the distinction now asserted, and not in denial of the binding effect of ordinances in general, is evidenced by the fact that in those same states the liability to private suit for violation of ordinances passed in the exercise

of the police power is fully recognized. *Knupfle* v. *Knicker-bocker Ice Co.,* 84 *N. Y.* 488; *Connolly* v. *Knickerbocker Ice Co.,* 114 *Id.* 104; *McRickard* v. *Flint, Id.* 222; *Wright* v. *Malden and Melrose Railroad Co.,* 4 *Allen* 283; *Salisbury* v. *Herchenroder,* 106 *Mass.* 458; *Hall* v. *Ripley,* 119 *Id.* 135.

Turning now to the ordinance *sub judice,* upon which alone the defendant's liability is rested, we find it is entitled "An ordinance regulating street railways and providing for paving and repairing in the street through which street railways are built or operated." It consists of eight sections.

Section 1 provides that when the tracks of any street railway have been or shall be laid in any street in the city which at the time of laying the tracks shall be unpaved, it shall be the duty of the railway company laying the track or operating the railway to pave between the rails of the tracks, and between the tracks, and for the space of one foot outside of each outer track, with such pavements and in such manner as the board of street and water commissioners shall determine, and said pavements so laid shall by said company or its successors be kept in good and complete repair to the satisfaction of the board of street and water commissioners, or if not so kept and maintained the repairs thereto may be made by the board, and the cost thereof shall be paid on demand by the railway company to the board, provided the board shall give at least ten days' notice to the company of its intention to make such repairs.

Section 2. That where the tracks of any street railway company have been or shall be laid in any paved street it shall be the duty of the company laying the tracks or operating the railway to repave between the rails of the track and between the tracks, and for the space of one foot outside of each outer track, and to such further distance as may be necessary to bring the whole pavement of the street into proper conformity; the pavement to be of the same character and equal in quality to the pavement with which the remaining portion of the street is paved. Such pavement to be laid under the direction of the board, and to its satisfaction, and to be there-

after kept in repair by the company or its successors to the
satisfaction of the board; or if not so kept and maintained,
the repairs thereto may be made by the board, and the cost
thereof shall be paid, on demand, by the company to the
board, provided the board shall give at least ten days' notice,
in writing, to the company of its intention to make such re-
pairs.

Section 3. That where the board shall cause any street to
be paved or repaved, it shall be the duty of the railway com-
pany owning or operating a street railway in such street, at
the same time to pave or repave between its tracks, and for
the space of one foot on the outside of each outer track, with
such pavement and in such manner as the remaining portion
of the street is paved or repaved by the board; the pavement
to be laid and relaid under the direction of the board, and to
its satisfaction; and the pavement so laid to be thereafter
kept by the company in repair to the satisfaction of the board,
or if not so kept and maintained, the repairs thereto may be
made by the board and the cost thereof shall be paid on de-
mand by the railway company to the board, provided the
board shall give at least ten days' notice, in writing, to the
company of its intention to make such repairs.

Section 4. That where the tracks of any street railway
company, or any portion thereof, shall be taken up by the
company for any reason, or the pavement under the charge of
the company shall in any way be disturbed, it shall be the
duty of the company to at once relay the pavement so dis-
turbed or taken up, not only to the full width to which it has
been so disturbed, but to such further distance as may be
necessary to again bring the whole pavement of the street into
proper conformity, said work to be done under the direction
of the board, and to its satisfaction.

Section 5. That it shall be the duty of every street railway
company owning or operating a street railway to keep in thor-
ough repair, to the satisfaction of the board, the crosswalks
crossing the railway, and for one foot outside of the outer
track of the railway, said crosswalks to be in every way equal
in quality to the remaining crosswalks, and all new crosswalks

laid by the company to consist of stone not less than four feet in width and reaching between the tracks.

Section 6. That no company owning or operating any street railway shall take up any pavement or crosswalk, except for the purpose of repair, without the consent of the board or of the superintendent of works, and no street railway shall alter or change the grade of its tracks without the consent of the board.

Section 7. That in case any street railway company shall fail to pave any portion of its tracks pursuant to the terms of this ordinance, to the satisfaction of the board, the board, upon ten days' notice to the company, may cause the pavement to be laid or taken up, and the said portion of the street to be paved or repaved, to the satisfaction of the board, and the company shall, upon demand, pay to the board the cost thereof.

Section 8. That the board reserves to itself the right to appoint inspectors to supervise any paving or repaving to be done by any street railway company pursuant to the terms of this ordinance, and the cost of such inspectors shall be refunded and paid to the board by the company on demand; and all permits to lay down street railway tracks or to locate street railways, or to open the streets for the relaying of tracks shall be expressly subject to all the terms of this ordinance.

Assuming the validity of the ordinance, it seems to us not to admit of the construction that it was designed for the safety of travelers upon the street as a class. On the contrary, the design is to impose upon the street railway company a share of the public burdens of the municipal government. The prime object is the relief of the municipal treasury; the duties imposed are to be performed by the company as one of the municipal agencies and under the immediate supervision of a municipal board, and the ordinance provides that, for any omission by the company to comply with its terms, the remedy shall be applied by the board itself, in proceeding to do the work and recovering the costs thereof from the company. There is no penalty imposed upon the company; there

is nothing to indicate that it is done for the safety or pro-
tection of travelers upon the street; there is nothing in the
language to indicate that it was the intent of the municipal
authority, in passing the ordinance, that it should give rise
to an action against the company by any citizen aggrieved
through a breach of its provisions.    There is no discretion
given to the company as to the mode or style of paving or
repairs; on the contrary, it is within the fair intendment of
the ordinance that all work which is required to be done by
the street railway company shall be done under the immediate
direction of the board of street and water commissioners, or
its inspectors and supervisors.

But if there be any doubt about our construction of this
ordinance, there remains the question of its validity.

In the opinion of the Supreme Court it is said that the
ordinance was passed under due legislative authority for the
regulation of all street railways; that it is a police regulation,
in which the traveling public are concerned, and that the
burden thus laid upon the operating companies is one fairly
within proper police regulation, and could constitutionally be
imposed as a condition of the exercise of a franchise in a pub-
lic street, whether under an irrepealable contract or otherwise.

This statement, it will be perceived, recognizes the import-
ance of seeking out the source of power, as having a bearing
upon the validity of the ordinance, as well as upon its proper
construction if valid.

By way of legislative authority we are referred to *Pamph.
L.* 1857, *p.* 116, and *Pamph. L.* 1891, *p.* 249, § 12.    No other
legislation was referred to in the argument before us.    The
enactment of 1857 is the revised charter of the city of New-
ark, by which a common council was established, with power
to make ordinances to regulate and keep in repair the streets,
to license and regulate vehicles and carriages used for the
transportation of passengers and merchandise, to grade and
pave the sidewalks, &c.    The act of 1891 had the effect of
establishing a board of street and water commissioners, who
became vested with the powers formerly vested in the common
council, including the general control over the streets, and

with the express power to pass ordinances to regulate and control the use of streets and public places by foot passengers, vehicles, railways and engines, and to grant franchises and locations to street railway companies for the operation of railways; subject, however, to the limitations contained in the general laws of the state relative thereto. The constitutionality of this statute has been sustained by the Supreme Court. *In re Haynes,* 25 *Vroom* 6.

The powers to which we are thus referred are properly classed among the police powers of the municipality.

The distinction between the police power and the taxing power is entirely clear. The former extends merely to the regulation of those matters that are confided by the legislature to the municipal corporation for that purpose, including the power to exact reasonable fees, not for the purpose of revenue, but only as incidental to the power of regulation. The power of taxation is exerted in order to compel citizens and property-owners to contribute to the support of the municipal government. *Tiedm. Mun. Corp.,* §§ 116, 123, 124, 253; *Dill. Mun. Corp.* (4th ed.), §§ 141, 357–360, 768. The power to regulate the use of the public streets, including limitations upon the speed of travel, the exclusion of vehicles from the sidewalks, the regulation of public conveyances, and the like, are instances of the exercise of the police power. *Id.,* § 393.

Nowhere, it is believed, has the distinction between the police power and the taxing power been kept more clearly in view than in New Jersey. Our courts, while giving full scope and reasonable construction to the powers delegated by the legislature to the municipalities, have been careful to check any usurpation of the taxing power attempted under the guise of police regulation. A conspicuous example is to be found in the decision of the Supreme Court in *North Hudson County Railway Co.* v. *Hoboken,* 12 *Vroom* 71. As this decision is cited in the opinion now under review as authority for the proposition that an ordinance requiring a street railway company to pave the street and maintain the pavement is fairly within proper police regulation, and as it has been elsewhere cited to the same effect (*Booth St. Ry. L.,* § 243

(note) ; *Cape May Railroad Co.* v. *Cape May,* 30 *Vroom* 401), it deserves more than a passing mention.

The report of the case shows that after the railway company had constructed, under legislative sanction, certain lines of street railway, operated with horses, the municipal council adopted certain ordinances, general in their effect, which, among numerous other provisions, required all street railway companies to take out licenses for the running of their cars, and thereupon to pay into the city treasury annual license fees of $15 for each one-horse car and $25 for each two-horse car; at the same time imposing a penalty for each time any car should be run without license. These ordinances were brought under review by writ of *certiorari.* The report shows that the argument of the counsel of the prosecutor was directed to the validity of those parts of the ordinances that required the taking out of licenses and the payment of license fees. The opinion of the Supreme Court was delivered by Mr. Justice Depue (afterwards Chief Justice), who, near the outset of the discussion, used this language:

"A municipal corporation, under the ordinary powers of local government, in virtue of its control over its streets, may adopt reasonable regulations for the government of the city, for the preservation and safety of its streets, and for the maintenance of good order. The provisions in these ordinances, requiring the tracks to conform to grade, and to be laid under the direction of the street commissioner; for keeping in repair the space between the rails; requiring bells to give warning of the approach of the cars; providing for the removal of snow, and the like, are of the character of regulations which may be adopted, and, if reasonable, are valid. Such regulations do not appreciably interfere with the exercise of its franchise by a corporation having the franchise to use the public streets for its business; they are necessary for the good government of the city, and the legislature is presumed to have intended, when it authorized the use of the public streets for such purposes, that its grantee should hold its privileges subject to such regulations as are reasonably necessary for the common use of the streets for the purposes

of a street railway and for ordinary travel. But an ordinance requiring a license as the condition under which a railway company shall be permitted to run its cars, and exacting a license fee therefor, is quite a different thing."

The learned justice then proceeds to show that the function of granting licenses is an incident of the police power of regulation; that the grant of power to license does not carry, by implication, the power to charge license fees for revenue; and that the exaction of license fees for revenue purposes is clearly an exercise of the taxing power, and cannot be sustained unless the charter plainly shows an intent to confer that power. And so the ordinances were set aside so far as they affected the prosecutor by imposing license fees.

If the language quoted from this opinion were intended to mean that the police power justified the imposition upon street railway companies in general of the duty of repairing the streets and of removing snow therefrom, it would be quite incongruous with the point actually decided, and to which much stress of argument was devoted. What the learned justice said, however, was merely that "the provisions in *these* ordinances" (meaning the ordinances before the court), so far as they applied to certain things that he mentioned, were "*of the character*" (that is, within the category) of regulations that, *if reasonable,* would be valid. He did not say that the regulations in question were either reasonable or valid; he did not undertake to say specifically what they were. They do not appear in the report of the case, because they were not the subject of attack, or even of discussion. The opinion shows that he referred to them only casually, as instances of the exercise of the power of regulation, so that he might illustrate by antithesis the character of the licensing clauses that were under criticism. If any greater significance was intended to be given to the language quoted, it was manifestly *obiter dictum.*

An examination of the ordinances that the learned justice had before him, which may be found among the files of the Supreme Court, shows the correctness of what has just been said. The original ordinance was approved June 27th, 1861,

and contains ten sections, the first of which enacts, in substance, that *when any permission shall hereafter be granted* to any person or corporation to lay tracks and run cars over the streets of the city, *such person or corporation* shall be subject to the following conditions and restrictions: That the tracks shall be laid under the direction of the street commissioner and committee on streets; that the rails shall be laid on the established grades, and shall at all times conform to grades hereafter established; that such person or corporation shall keep in good repair the space between the rails and two feet on each side of the outer rails, &c. Section 2 requires all companies to keep bells upon their horses to give warning of their approach, limits the speed to six miles an hour, requires the cars to be lighted at night, and further provides that, in clearing or removing the snow or ice from the tracks, it shall be done so as not to interrupt public travel or interfere with the rights of abutting property-owners, and that no salt or other melting substance shall be used for removing the snow. The remaining sections, so far as they apply to companies already existing, are regulative merely, excepting the one that imposed the annual license fee for each car; and this, by its terms, applies not only to companies thereafter to be authorized to construct tracks, but also to companies already in operation. The amendatory ordinances relate solely to the system of licensing attempted to be established by the ordinance of 1861.

It will be seen that there was nothing in the ordinances requiring the repair of the streets by companies already established. The declaration was that companies obtaining permission in the future to lay tracks must take it subject to the condition indicated. These were the days of horse railroads, whose operations had the effect of concentrating the wear and tear upon a limited portion of the street; and the proposition was that, as a *quid pro quo* for a local "franchise," any new horse railroad company should agree, not, indeed, to pave or repave, but to repair the street. It will also be noticed that nothing in the ordinances *required* the removal of snow; the requirement was that if the company

desired to remove the snow for its own convenience, it should do so in a manner not to interfere with the rights of others.

So much for the Hoboken case. It has been much misunderstood. It is a clear authority against, not in favor of, any construction of the police power that would permit it to be employed for purposes of revenue. That case was followed by the Supreme Court in *Cape May* v. *Cape May Transportation Co., 35 Vroom* 80, where it was again held that an ordinance imposing license fees for revenue upon a street railway company could not be supported as an exercise of the police power.

In the following cases the Supreme Court has sustained municipal regulations imposed upon street railways in the exercise of the police power, viz., an ordinance requiring horse railroad companies to have an agent upon each car, in addition to the driver, to assist in the control and care of the car and its passengers, and to prevent accidents and disturbances of the good order and security of the streets (*Trenton Horse Railroad Co.* v. *Trenton*, 24 *Vroom* 132) ; an ordinance prohibiting the placing of salt upon street railway tracks, except on curves leading from one street to another (*Traction Co.* v. *Elizabeth*, 29 *Id.* 619) ; an ordinance limiting the rate of speed of electric cars running in the streets (*Cape May Railroad Co.* v. *Cape May*, 30 *Id.* 393) ; an ordinance requiring the use of fenders on the front of electric cars to prevent accidents (*Cape May Railroad Co.* v. *Cape May, Id.* 396) ; an ordinance requiring electric cars to come to a full stop at each street before crossing it (*Cape May Railroad Co.* v. *Cape May, Id.* 404) ; an ordinance having the effect of prohibiting a trolley company, already authorized to string electric wires upon poles in the streets, from cutting or trimming any trees in so doing without first obtaining permission from the governing body. *Consolidated Traction Co.* v. *East Orange, 32 Id.* 202. No criticism is now made upon any of these decisions. They give no support to the present ordinance.

This court, as it happens, has not been called upon to deal directly with the question of municipal regulation of street

railways. But the power of the municipality to regulate the crossings of streets by steam railroads has been more than once brought here for consideration. In *Pennsylvania Railroad Co.* v. *Jersey City,* 18 *Vroom* 286, it was held that an ordinance prohibiting the obstruction of a crossing for more than three minutes at a time was within the granted powers of regulation of the streets and of railways; that such regulations must be reasonable; and the ordinance in question being plainly reasonable in its general application to crossings throughout the city, and open to question in this respect only as to three streets near the terminal of one railroad, this court refused to set aside the ordinance *in toto,* leaving the railroad company to raise the objection of unreasonableness with respect to either of the three crossings in any proceeding that might be taken to enforce the ordinance. In *Morris and Essex Railroad Co.* v. *Orange,* 34 *Id.* 252, this court held that the police powers of government are sufficient to authorize imposing upon a steam railroad company the duty of protecting the public at grade crossings over city streets by the erection and maintenance of gates and the employment of flagmen; and that therefore, in proceedings taken by the municipality to ascertain damages allowable for the opening of a street, the railroad company, while entitled to compensation, was not entitled to have the cost of the gates and flagmen included in the allowance.

In many other cases in the Supreme Court the distinction between the police power and the taxing power has been discussed. *Kip* v. *City of Paterson,* 2 *Dutcher* 298; *State, Benson* v. *Hoboken,* 4 *Vroom* 280; *Delaware, Lackawanna and Western Railroad Co.* v. *East Orange,* 12 *Id.* 127; *Muhlenbrinck* v. *Commissioners,* 13 *Id.* 364; *Clark* v. *New Brunswick,* 14 *Id.* 175; *Morgan* v. *Orange,* 21 *Id.* 389; *Mulcahy* v. *Newark,* 28 *Id.* 513; *Cape May* v. *Transportation Co.,* 35 *Id.* 80. And two cases in this court may be mentioned. *Haynes* v. *Cape May,* 23 *Id.* 180; *Johnson* v. *Asbury Park,* 31 *Id.* 427, 430.

It is needless to say that this extended reference to familiar decisions has been made, not for the purpose of showing the existence of a distinction that is so universally recognized, but

for the purpose of showing how rational is the distinction, and how easy of application; and in order to demonstrate how impossible it is that a power conferred by the legislature for the purpose of regulating the streets of a city, and the use of the streets by traction companies and others, can, by any defensible interpretation, be so stretched as to cover an ordinance of the character of that now before us. The traction company is in the enjoyment of a public franchise granted by the legislature; it has a use of the streets differing only in kind from that of other citizens using them, and has no interest in the soil; it is under a general obligation to keep its rails in repair so they shall not become an obstruction to travel; it is also bound by any contract it may lawfully have made with the municipality in consideration of the grant of its local privileges. But, entirely independent of any such consideration, and irrespective of any disturbance of the street surface in the operation of the railway, this ordinance attempts to impose upon every traction company the duty to pave a considerable portion of every street over which it passes, although it may bring no additional wear and tear upon the pavement; and the further duty to keep such pavement, when laid, at all times in repair. To call this "regulation," or an exercise of the police power, is a misuse of terms. It is taxation, pure and simple. It calls upon the company to perform a function not essentially different in character, although vastly more onerous, than the once-familiar operation known as "working out" the township road taxes by the labor of the inhabitants. *Gen. Stat.,* p. 2817, § 51, &c. A power that will not support the imposition of license fees fixed on a revenue basis, will certainly not support an ordinance of this character.

We therefore hold that the ordinance is not supportable as an exercise of the police power; and since no other legislative authority exists for its enactment, it imposed no duty upon the defendant company to repair the pavement between its rails or to repave that portion of the street.

We have not forgotten the "Act to provide for the incorporation of street railway companies and to regulate the

same," approved April 6th, 1886. *Pamph. L., p.* 185; *Gen. Stat., p.* 3216. Section 18 is as follows: "That every street railway company incorporated under this act shall keep in repair, to the satisfaction of the local authorities, the paving, upper planking or other surface material of the portions of streets, roads and bridges occupied by its tracks, and if such tracks occupy unpaved streets or roads, shall, in addition, so keep in repair eighteen inches on each side of the portion occupied by its tracks; provided, that nothing in this section shall be deemed to affect or repeal existing provisions of any municipal charter or any ordinance or regulation heretofore passed or adopted."

There is nothing in this case to show when or under what legislative authority the defendant company was incorporated. Nor was this statute invoked in the argument of the learned counsel for the plaintiff in this court. We cannot assume that the defendant was incorporated under that act, in view of the existence of other legislation to which its origin may as naturally be attributed. We are therefore relieved from considering whether section 18 of this act creates a liability in favor of any member of the traveling public who may sustain damage through the non-repair of the street.

The judgment should be reversed, and a *venire de novo* awarded.

FORT, J. (dissenting). In this case I am unable to agree with the majority of the court. I should be willing to affirm upon the opinion of Mr. Justice Collins in the Supreme Court, reported in 38 *Vroom* 76.

The conclusion reached by the Supreme Court in that opinion is, in my judgment, based upon a proper application of the police power and also upon a wise public policy.

I agree with Mr. Justice Pitney in his opinion in this case wherein he declares that "the plaintiff, at the time of her injury, was not in the exercise of her rights as a passenger in the act of leaving the defendant's car," and that, if she can recover, it is only upon the theory that the defendant, by a failure to repair the hole in the highway lying between

its tracks, had failed to perform some duty which it owed to the plaintiff as one of the public.

It is misleading, in my view, to refer to this case as one in which the failure of the defendant is a failure to repair the surface of the street. The hole in the highway was at a street crossing and abutting upon the rail of the track or its foundation, and the failure to repair at this point was a failure to repair its tracks, within the well-recognized principles of law applicable to the duty to repair tracks laid upon a railway company having a right to lay tracks in the public streets. The majority opinion in this case concedes that "it is familiar law that a railway company, having the right to lay tracks in a public street, is bound by the general principles of the common law, and, without either a specific statute or ordinance, or a contractual obligation, to lay its tracks in a proper manner, and to keep them in a proper state of repair." This principle thus stated is clearly sustained by 2 *Thomp. Negl. (2d ed.),* § 358, cited in that opinion.

I am at a loss to perceive how the duty to repair the hole between the tracks was not one of the duties to repair the track, which was incumbent upon the defendant company, under its implied obligation to so construct and maintain the rails of its track as that they should be free from danger to persons lawfully using the highway. I regard the tracks as contemplating all between the rails as laid in the public highway.

The defendant's counsel, at the hearing and in his brief, admitted that if the defendant company did not have actual knowledge of the condition of its tracks at the point in question, it was chargeable with such knowledge, because of the length of time the track had been in the condition it was at the time the plaintiff was injured, and applying the principle of law, stated in the majority opinion, to the facts in this case, that "if the defendant was under an absolute duty to repair the pavement, it was, at the same time, under a duty to observe its condition," it seems impossible to escape the conclusion arrived at by the Supreme Court.

It is held by the Supreme Court, and not controverted by the majority opinion in this court, that the ordinance of the city of Newark, in evidence in this case, and upon which the plaintiff, in part, relied, requires the repairing by the defendant company between its tracks, and that the charter of the city of Newark, passed in 1836 and cited in the opinion of the Supreme Court, under the authority of which said ordinance was adopted, was in force at the time the defendant company took over the street railway which had its tracks upon Mulberry street, in the city of Newark, and also at the time of the incorporation of the defendant company. Where a street railway company takes a franchise from a municipality to operate a street railway within the limits of such municipality, it takes it subject to the power of such municipality to regulate, under such franchise, its use of the streets and its duty to pave and repair between the tracks as, expressly or impliedly, authorized by the municipal charter.

I am also clear, in my view, that such a provision of a city charter or of an ordinance passed under it, is not for the benefit of the city, *per se,* but is for the protection of the traveling public. Especially must this be true with regard to a provision with relation to the paving and repairing of that portion of the highway lying between the rails constituting the tracks of the company. The city does not pave for its own purposes, *per se.* Paving is for the the use of the public. Both those of the public who pass over it with horses and carriages and those who pass on foot. A corporate entity does not travel and does not need paved streets.

In *Sonn* v. *Erie Railroad Co.,* 37 *Vroom* 428, this court held that a provision of the charter of the Erie Railway Company which required it to keep its crossings at public highways secure for travel, laid upon it a duty to the public, and for default in so doing it was liable in damages to a person injured because of its neglect of this duty. The principle of that case obtains where any duty is imposed by statute, or an ordinance lawfully passed under statutory authority, and it matters not whether the duty is in a special charter, a general act or a lawful ordinance.

In the majority opinion there is a discussion of the question as to whether the ordinance of the city of Newark, which attempts to impose a duty upon the defendant company to pave its tracks, is not void because such an imposition is in effect taxation. I shall not discuss that question farther than to express dissent from that view, for the reason that that question is not, in my judgment, in this case for decision.

I am authorized to say that Justice Hendrickson and Judge Bogert concur in the views here expressed.

I vote to affirm.

VREDENBURGH, J. I concur in the dissenting opinion of Mr. Justice Fort in this case as a whole, but desire to especially emphasize my adherence to the doctrine therein contained wherein it is said that "a city charter or an ordinance passed under it is not for the benefit of the city, *per se,* but is for the protection of the traveling public. Especially must this be true with regard to a provision with relation to the paving and repaving of that portion of the highway lying between the rails constituting the tracks of the company. The city does not pave for its own purposes, *per se.* Paving is for the use of the public."

For these reasons I also vote to affirm.

*For affirmance*—FORT, HENDRICKSON, BOGERT, VREDENBURGH. 4.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, VAN SYCKEL, PITNEY, ADAMS, VROOM. 6.